# UNREPORTED DECISIONS



Not Reported in A.2d                                                                                                   Page 1

Not Reported in A.2d, 2004 WL 1965866
(Cite as: Not Reported in A.2d)

C
Not Reported in A.2d, 2004 WL 1965866
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
Lisa AYERS
v.
Allen QUILLEN d/b/a Never Never Land Kennel & Cattery
No. Civ.A.03C-02-004-RFS.

Submitted March 26, 2004.
Decided June 30, 2004.

Dear Counsel:

STOKES, J.

\*1 This is my decision on Defendant, Allen Quillen's Motion for Summary Judgment and Motion in Limine. For the following reasons, Defendant's Motion for Summary Judgment is granted in part and denied in part. Plaintiff may proceed in her cause of action under the Consumer Fraud Act, however, she has no cause of action under the Deceptive Trade Practices Act. Plaintiff will not be able to seek punitive damages. Defendant Quillen is not excused from liability on the basis that he is shielded by the incorporation of his business. Defendant's Motion in Limine is granted as to the limitation of compensatory damages for the negligence and negligent bailment claims. Plaintiff's request for an award of attorney's fees for the defense of these motions is denied.

STATEMENT OF THE CASE

In mid December 2002, Lisa Ayers ("Ayers") boarded her three dogs at Never Never Land Kennel & Cattery ("the Kennel"), a Delaware Corporation. Sometime on December 16, 2002, two of her dogs, Sydney and Brie, were attacked by two homeless "rescue" dalmatians that had been taken in by the Kennel's owner, Allen Quillen ("Quillen"). Ayers' dogs were either in a communal yard or in their own boarding run, adjacent to the cage in which the dalmatians were housed. All cages are secured with a horse shoe lock and a clip latch. Somehow the dalmatians managed to escape their cage, either because the lock was not properly secured or because they managed to create a gap between the gate and the post by jumping against it.

Mr. Quillen was not present during the incident, however, the Kennel manager, Kimberly Wade ("Wade") who was present, notified him at his home on the Kennel grounds. They took the injured dogs to Rehoboth Animal Hospital where they were treated and prescribed medication. Quillen and Wade decided not to inform Ayers that her dogs had been injured, as she was coming the next day to pick them up. When Ayers picked up her dogs on December 17, 2002, Quillen told her that they had been bitten by one of the other dogs. In addition to covering the medical expenses from Rehoboth Animal Hospital (ranging from $500 to $800), Quillen did not charge Ms. Ayers for the time the dogs were boarded at the Kennel.

Plaintiff has filed suit based on the theories of gross negligence, negligence, consumer fraud, deceptive trade practices, and negligent bailment. As relief, she is seeking damages, compensatory damages, special damages, punitive damages, costs, attorneys fees, and any other relief the Court may deem appropriate. Ayers is seeking compensatory damages for follow-up veterinarian visits, including wound treatment, a follow-up exam and surgery on Sydney, and a physical exam for Brie. The total bill amounts to $822.28.

Defendant has filed this Motion for Summary Judgment seeking judgment in his favor on the issues of violations of the Deceptive Trade Practices Act, violations of the Consumer Fraud Act and Plaintiff's request for punitive damages. In addition, Defendant requests that all claims against Allen Quillen as an individual be dropped, as Ayers

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                  Page 2
Not Reported in A.2d, 2004 WL 1965866
**(Cite as: Not Reported in A.2d)**

was dealing with the Kennel, which is a corporation. Moreover, Defendant has filed a Motion in Limine seeking to limit the amount of damages for negligence and negligent bailment.

DISCUSSION

A. Standard of Review

*2 This Court will grant summary judgment only when no material issues of fact exist, and the moving party bears the burden of establishing the nonexistence of material issues of fact. *Moore v. Sizemore,* 405 A.2d 679, 680 (Del.1979). Once the moving party meets its burden, the burden shifts to the nonmoving party to establish the existence of material issues of fact. *Id.* at 681. The court views the evidence in a light most favorable to the nonmoving party. *Id.* at 680.

Where the moving party produces an affidavit or other evidence sufficient under *Superior Court Civil Rule 56* in support of its motion and the burden shifts, the nonmoving party may not rest on its own pleadings, but must provide evidence showing a genuine issue of material fact for trial. *Super. Ct. Civ. R. 56(e); Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986). If material issues of fact exist or if the Court determines that it does not have sufficient facts to enable it to apply the law to the facts before it, then summary judgment is not appropriate. *Ebersole v. Lowengrub,* 180 A.2d 467, 470 (Del.1962).

B. Quillen's Liability as an Individual

Defendant has requested that all causes of action against Quillen as an individual be dropped. Plaintiff claims that she has a cause of action against Quillen because he was an agent for an undisclosed principal. According to this theory of liability, an agent who makes a contract, " purporting to act upon his own account, but in fact making a contract on account of an undisclosed principal, is a party to the contract." Restatement (Second) of Agency § 322 (1958). *See Persia, Inc. v. Kennedy,* 1984 WL 402552 (Del.Com.Pl.) ; *Taylor v. Conforti,* Del.Super. Ct., No. 361, 1975, Taylor, J. (September 15, 1975). *See also* 2A C.J.S. *Agency* § 363 (1972). However, in this case, Plaintiff is not suing for breach of contract. Rather she is suing for negligence, gross negligence, negligent bailment FN1 and pursuant to the Consumer Fraud Act and the Deceptive Trade Practices Act-all are tort or statute-based claims. Thus, the undisclosed principal doctrine does not apply to make Quillen liable as an individual. He is still not excused from liability, however.

> FN1. A party may elect to bring a cause of action for either breach of a bailment contract or for negligence of the bailee for the mishandling of property:
> Actions in tort or sounding in tort may also be appropriate when the bailee's violation of a duty or obligation imposed by the bailment is not only a breach of the bailment contract, but also a tort, and the bailor may elect to affirm the contract and, waiving the tort, bring an action ex contractu, or the bailor may abandon the contract and proceed against the bailee in an action ex delicto. Thus, in an action against a bailee for failure to return bailed property, the bailor may proceed on alternate theories of general negligence of the bailee, specific negligence of the bailee, or breach of the bailment contract.
> 8A Am.Jur.2d *Bailments* § 206 (1997).
> Plaintiff has chosen to bring a cause of action under a negligence theory, thus this issue will be treated as one of tort law only.

In certain circumstances, corporate officers and directors in Delaware may be liable for their active participation in tortious conduct even if they are officially acting for the corporation. *T.V. Spano Bldg. Corp. v. Wilson,* 584 A.2d 523, 530-31 (Del.Super.Ct.1990), *aff'd sub nom. T.V. Spano Bldg. Corp. v. Dep't. of Natural Res. and Envtl. Control,* 628 A.2d 53, 61 (Del.1993). Accord *St. James Recreation, LLC v. Rieger Opportunity Partners, LLC,* 2003 WL 22659875, at *6 (Del. Ch.) ; *Stonington Partners, Inc. v. Lernout & Houspie*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d    Page 3

Not Reported in A.2d, 2004 WL 1965866
**(Cite as: Not Reported in A.2d)**

*Speech Products,* N.V., 2002 WL 31439767, at *8 (Del. Ch.) ; *State ex rel. Brady v. Preferred Florist Network, Inc.,* 791 A.2d 8, 21-22 (Del. Ch.2001) ; *Heronemus v. Ulrick,* 1997 WL 524127, at *1 (Del.Super.Ct.). As noted in *T.V. Spano Bldg. Corp. v. Wilson,* this rule of liability is based upon principles of agency law. 584 A.2d at 531. The Supreme Court, in affirming the decision of the Superior Court on narrower grounds, refused to decide, however, whether anyone besides a corporate officer, i.e. a director, employee or agent, could be liable. *T.V. Spano Bldg. Corp. v. Dep't. of Natural Res. and Envtl. Control,* 628 A.2d at 61 n. 10 (Del.1993) (*"T.V.Spano"*) (finding a corporate officer to be a "responsible party" under 7 *Del. C.* § 6308 such that he could be liable for improper disposal of hazardous waste.) Thus, a question arises as to in what capacity Quillen was serving with the Kennel and how his position would be treated under Delaware law for the purposes of determining personal liability.

*3 In this regard, he was the owner, and he had a proprietary stake in the corporation. His mother owned the Kennel before him, and his interest was created about five years ago. Def.'s Mot. Ex. 2 at 53. Quillen was the person with the most control over the affairs of the corporation. When the dogs were injured, Wade, the Kennel's manager, contacted Quillen before any action was taken. He was present when Ayers came to pick up her dogs, and it was he who told her about the incident and who made the decision to cover the medical expenses himself and to not charge her for her dogs' stay at the Kennel. Viewing these facts from Ayers' perspective, Quillen was acting as an agent for the Kennel with a managerial or directorial role, despite his lack of an official title.

According to the Restatement (Second) of Agency § 343 (1958), "[a]n agent who does an act otherwise a tort is not relieved from liability by the fact that he acted ... on account of the principal...." As principles of agency are applied to corporate officers, directors and employees, the general rule is discussed in 3A William Meade Fletcher, *Fletcher Cyclopedia of the Law of Private Corporations* § 1135 (perm. ed. rev.vol.2002):
  A person is personally liable for all torts which that person committed, notwithstanding the person may have acted as the agent or under directions of another. This rule applies to torts committed by those acting in their official capacities as officers or agents of a corporation. It is immaterial that the corporation may also be liable.
*See also* 18B Am.Jur.2d *Corporations* § 1877 (1985) ; 19 C.J.S. *Corporations* § 544 (1990).

However, considering the purpose of limited liability, a principle central to corporate law, an injured party must prove the officer, director or agent participated in the tort. *See id.* § 1137. "Some knowledge and participation, actual or implied, must be brought home to the agent." *Id. See also* 19 C.J.S. *Corporations* § 544 (1990) ("A director, officer, or agent is not liable for torts of the corporation merely because of his office; he is liable for torts in which he has participated or which he has authorized or directed.") This is also the case in Delaware for liability against an officer to ensue. "[K]nowledge of the act is not enough.... The corporate officer must have been actively involved in that the officer directed, ordered, ratified, approved or consented to the tort." *Heronemus,* 1997 WL 524127, at *2. An officer can only be held liable for misfeasance or active negligence and not for nonfeasance or the omission of an act. *Id. See also T.V. Spano,* 628 A.2d at 61-62 (finding the officer, Spano, was not personally liable because he did not direct, order, ratify, approve or consent to the improper disposal of hazardous waste).

This standard also applies in this case, where an agent such as Quillen has significant responsibility in the corporation. Not only does he own the Kennel, but also he manages the business, much as an officer would manage and direct the daily affairs of a corporation. Thus, Quillen may be held personally liable for damages under tort theories, but Plaintiff will have the burden of proving his misfeasance or active negligence. Since neither side developed this issue, the Court will decide whether Ayers has met this burden at trial.

*4 Regarding the statutory claims, Quillen has no liability to Ayers under the Deceptive Trade Practices Act under well settled principles of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                    Page 4
Not Reported in A.2d, 2004 WL 1965866
**(Cite as: Not Reported in A.2d)**

Delaware law. *See* discussion, *infra.* As to the Consumer Fraud Act, however, 6 *Del. C.* § 2513 applies to "any person." Section 2511(5) of the Act defines "any person" to mean "an individual, corporation, government, or ... 2 or more of any of the foregoing having a joint or common interest or any other legal or commercial entity." The Consumer Fraud Act is to be liberally construed in keeping with its primary purpose of protecting the consumer. *Young v. Joyce,* 351 A.2d 857, 859 (Del.1975). *Accord Thomas v. Harford Mut. Ins. Co.,* 2003 WL 220511, at *4 (Del.Super.Ct.). In *T.V. Spano,* 628 A.2d at 60, the Supreme Court applied the common meaning to the undefined term, "responsible party," under 7 *Del. C.* § 6308 of the Hazardous Waste Management Act. In so doing, it found that a responsible party could be a "person," a term which was defined in § 6302(10) of the Act to include "an individual, trust, firm, joint stock company, federal agency, corporation ... or any interstate body." *Id.* The Court went on to say, "[a]lthough the definition does not specifically mention officers of a corporation, the definition is broad enough to include a corporate officer as a responsible party...." *Id.* The Chancery Court, in *State v. Preferred Florist Network, Inc.,* 791 A.2d 8, 21 (Del. Ch.2001), applied the reasoning of *T.V. Spano* to find that a corporate officer was not shielded from liability under the Consumer Fraud Act despite the fact he was acting in his corporate capacity.

As in *T.V. Spano,* under the Consumer Fraud Act, the intent of the legislature to make those individuals who are responsible for misleading consumers responsible for their actions is evident from the language used in the statute. "Any person" is defined to include "an individual," a "corporation," or "2 or more of any of the foregoing having a joint or common interest." The statute contemplates that both the corporation and an individual who might have a common interest in the profits and success of the business would be liable. This Court finds that the definition of "any person" is broad enough to include an agent of a corporation who is responsible for consumer fraud under the terms of the Act. Given Quillen's extensive role in the running of the Kennel and his status as owner, it would subvert the purpose of the Consumer Fraud Act to find that he could not be held liable for any role he might possibly have played in defrauding consumers. *See United States v. Northeastern Pharmaceutical,* 810 F.2d 726, 745 (8th Cir.1986), *cited in T.V. Spano,* 628 A.2d at 61 (" 'imposing liability upon only the corporation, but not those corporate officers and employees *who actually make corporate decisions,* would be inconsistent with [the Legislature's] intent to impose liability upon the persons who are involved in the handling and disposal of hazardous substances' "). Once again, however, it is not enough that the officer, director, agent or other employee knew of the deception. "Rather, [he] must be shown to have been 'actively involved in the alleged violative activity." '*See T.V. Spano Bldg. Corp.,* 628 A .2d at 61 (citation omitted).

C. The Deceptive Trade Practices Act

*5 Plaintiff Ayers has filed a claim under 6 *Del. C.* § 2532, *et seq.,* The Deceptive Trade Practices Act (" the DTPA"), alleging that Defendant created a likelihood of confusion or of misunderstanding by promoting the Kennel as safe. As the defendant points out, however, a consumer has no standing to state a cause of action under the DTPA. *See Grand Ventures Inc. v. Whaley,* 632 A.2d 63 (Del.1993). " The Act is intended to address unfair or deceptive trade practices that interfere with the promotion and conduct of another's business. Unlike the Consumer Fraud Act, the DTPA is not intended to redress wrongs between a business and its customers." *Id.* at 65. It is the Consumer Fraud Act, addressed *infra,* which provides a cause of action for a consumer.
> In short, the most logical interpretation of the Consumer Fraud Act in conjunction with the DTPA is that the Consumer Fraud Act provides remedies for violations of the "vertical" relationship between a buyer (the consumer) and a producer or seller.... Conversely, the DTPA addresses unreasonable or unfair interference with the "horizontal" relationships between various business interests.

*Id.* at 70.

*See also Crosse v. BCBSD, Inc.,* 836 A.2d 492

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                        Page 5
Not Reported in A.2d, 2004 WL 1965866
**(Cite as: Not Reported in A.2d)**

(Table), 2003 WL 22214021, at *4 (Del.) ; *S & R Assoc. v. Shell Oil Co.,* 725 A.2d 431, 440; *Ewing v. Bice,* 2001 WL 880120, at *7-8 (Del.Super. Ct .). Since Ayers is a consumer of the services the Kennel provides and is not a competing business, she has no standing to bring a claim under the DTPA. As to this issue, Summary Judgment is granted on behalf of Defendant.

### D. Consumer Fraud Act

Ayers has brought a claim under 6 *Del. C.* § 2513(a) of the Consumer Fraud Act, 6 *Del. C.* § 2511, *et seq.* Section 2513(a) provides:
> (a) The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled, deceived or damaged thereby, is an unlawful practice.

Ayers alleges that Quillen and the Kennel engaged in consumer fraud by advertising the safety of its kennels on its web page with the claim that "no ' would be escape artist' could climb out." She also claims that the whole tone of the advertisement falsely represented that the Kennel was safe.

In *Brandywine Volkswagen Ltd.,* 306 A.2d 24, 27 (Del. Super Ct.1973), the Court first set out the standard for resolving a cause of action under the Consumer Fraud Act, stating, "[t]he common thread which runs through ... actions under 6 *Del.C.* s 2513 is the making of a false or misleading statement or the concealment, suppression or omission of information, thereby creating a condition of falseness." The person making the false statement must know that it is untrue or must make it with reckless indifference to the truth. *Id.*
> *6 The general rule is that a person is chargeable with a false statement if it was made under such circumstances as to raise a presumption of his knowledge of the falseness. This principle applies where a person has a duty to know the truth or where the facts are peculiarly within the knowledge of the person making the statement.
> *Id.*

In addition to the requirement that there be a false statement, the statute requires that the person making the statement intend others to rely upon the deception, false promise or misrepresentation. *Id.* at 29. However, the consumer need not prove that she herself relied upon the false statement, only that the defendant made the statement with the intent that someone would rely upon it. *S & R Associates, Inc. v. Shell Oil Co.,* 725 A.2d 431, 440 (Del.Super.Ct.1998). The misleading statement must be made in connection with a sale, lease or advertisement, such that post-sale representations do not constitute consumer fraud under the Act. *Norman Gershman's Things to Wear, Inc. v. Mercedes-Benz of North America, Inc.,* 558 A.2d 1066, 1074 (Del.Super.Ct.1989) ; *Thomas v. Harford Mut. Ins. Co.,* 2003 WL 220511, at *4 (Del. Super Ct.).

Defendant Quillen has requested summary judgment on the basis that no false statements or representations were made and that any representations that may have been made on the website were not discovered by Ayers until after she had already solicited the services of the Kennel and thus were made post-sale. He also claims that the allegedly deceptive statement on the site has nothing to do with the incident in this case. The full sentence in question states, "[a]ll of these runs have solid tops to protect the dogs from sun or rain or to be extra sure no would be escape artists can climb out." Def.'s Mot. Ex. 2 at 32-33. As to this last claim, while the statement specifically relates to dogs escaping through the roof of the kennels and this incident involves dogs escaping through the gate, this distinction is inapposite. Plaintiff has made it clear that it is the website as a whole which is misleading and not solely the one sentence quoted.

Quillen's contention that the representations were made post sale misconstrues the idea presented in *Norman Gershman's Things to Wear* and in *Thomas.* In *Norman Gershman's Things to Wear,* the court stated:
> this Court cannot ignore the clear language of the statute which restricts its application to deceptive

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                           Page 6
Not Reported in A.2d, 2004 WL 1965866
(Cite as: Not Reported in A.2d)

practices 'in connection with the sale or advertisement' of the merchandise. Given this statutory limitation, it is clear that post-sale representations which are not connected to the sale or advertisement ... do not constitute consumer fraud under the Act.
558 A.2d at 1074. *Accord Thomas,* 2003 WL 220511, at *4.

The website is an advertisement for Quillen's business. Any statements made on it are representations "in connection with the sale or advertisement" of the Kennel's services. It does not matter that Ayers did not find out about the website until after she had boarded her dogs because she need not prove that she relied upon the ad. Plaintiff need only prove that the website existed before she boarded at the Kennel and that the false statement was on the website before that time and that it was intended to mislead customers. In this regard, Ayers has stated that the copyright on the website is 2001, approximately a year before the incident occurred.

*7 As to the falsity of the claims on the Kennel's website, however, Plaintiff must prove that Defendant knew the statements were false or that he negligently made the misrepresentation. *Norman Gershman's Things to Wear,* 558 A.2d at 1074. Ms. Ayers has presented evidence in testimony from a former employee of the Kennel, Angela Bailey (" Bailey"). She testified that the Kennel had "a recurring problem with employees forgetting to lock the gates with the snap latches." Pl.'s Response to Summary Judgment Mot. ("Pl.'s Response") ¶ 13. These allegations create enough of an issue of material fact to preclude summary judgment as to the issue of consumer fraud.

E. Punitive Damages

1. Plaintiff's Claim of Gross Negligence

Ayers claims Quillen and the Kennel were grossly negligent in failing to keep other dogs away from her dogs. She alleges that, as the owner, he had a heightened duty to keep boarded dogs safe and that he should have notified her and followed her instructions in providing medical care to the dogs. Complaint ¶ 's 24-34. As a result of Quillen's gross negligence, Plaintiff is seeking an award of punitive damages.

An allegation of gross negligence, however, does not suffice under Delaware law to justify a recovery of punitive damages. As the Supreme Court stated in *Jardel Co. v. Hughes,* 523 A.2d 518, 530 (Del.1987), "[i]n Delaware tort law the term 'gross negligence' has little significance.... [W]here reckless (wanton) or wilful conduct is required, either as a threshold for recovery, ... or as a prerequisite for the recovery of punitive damages, as in this case, even gross negligence will not suffice." By pleading gross negligence and by failing to allege recklessness, Plaintiff has failed to meet her burden of showing Quillen had the requisite state of mind for an award of punitive damages.

In her Response to the Motion, Ayers does briefly mention gross recklessness, stating, "[t]here are sufficient facts to establish gross negligence and gross recklessness and indifference to the rights of others." Pl.'s Response ¶ 17. Putting aside for a moment the issues of whether recklessness must be specifically averred in the complaint and whether the complaint would need to be amended for Ayers to properly bring this claim, even if the Court were to assume Ayers has properly alleged a reckless state of mind, it still could not find, as a matter of law, that Quillen's behavior amounted to " outrageous" conduct.

Like negligence, the issue of whether punitive damages should be awarded is one normally left to trier of fact. *Jardel Co., Inc. v. Hughes,* 523 A.2d 518, 527 (Del.1987). The leading Delaware case on this issue is *Jardel,* in which the Supreme Court stated:
> The penal aspect and public policy considerations which justify the imposition of punitive damages require that they be imposed only after a close examination of whether the defendant's conduct is "outrageous," because of "evil motive" or " reckless indifference to the rights of others." Restatement (Second) of Torts § 908, comment b (1979). Mere inadvertence, mistake or errors of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                     Page 7

Not Reported in A.2d, 2004 WL 1965866
**(Cite as: Not Reported in A.2d)**

judgment which constitute mere negligence will not suffice. *Id.* It is not enough that a decision be wrong. It must result from a conscious indifference to the decision's foreseeable effect.
*\*8 Id.* at 529.

In order to find a defendant reckless, there must be an actual or constructive awareness of one's conduct and "a realization of its probable consequences, while negligence lacks any intent, actual or constructive." *Id.* at 530.

> Two significant elements must be present for recklessness to exist. The first is the act itself, e.g. in accident cases the negligent operation of a motor vehicle or aircraft.... The second, crucial element involves the actor's state of mind and the issue of foresee ability, or the perception the actor had or should have had of the risk of harm which his conduct would create. The actor's state of mind is thus vital.

Plaintiff has presented insufficient evidence that Quillen was even aware or could have been on notice that a dalmatian could escape and attack another boarded dog violently. *See Jardel,* 523 A.2d at 531 (finding Jardel might have been on notice concerning incidents of general criminal conduct, but that no incident approached the level of violence of the crime alleged, rape). "Where the claim of recklessness is based on an error of judgment, a form of passive negligence, the plaintiff's burden is substantial. It must be shown that the precise harm which eventuated must have been reasonably apparent but consciously ignored in the formulation of the judgment." *Id.* No evidence has been presented of previous attacks at the Kennel.

While Bailey stated that there was a problem with securing snap latches, whether this problem could or would result in attack, could only have been speculation in the mind of Quillen. There is even a dispute as to whether it was the lack of a secure snap latch which allowed the dogs to escape. FN2 Ayers claims that dalmatians are inherently dangerous dogs; however, there is no indication that Quillen knew this, or that he knew that these particular rescue dogs were themselves dangerous dogs. Nor has Ayers provided any substantive proof that dalmatians are dangerous or that this is a widely understood fact.

> FN2. Plaintiff Ayers alleges that there are three different explanations as to how the dogs escaped:
> 1) the horseshoe mechanism had turned somehow, although the bolts securing it were not loose;
> 2) the latch had slid because of the cold weather; or 3) the latch, which had not been seated properly, came undone (indicating it was not secured with a clip) when the dalmatians jumped against the gate. Defendant Quillen claims that the locks were secure but that because of the unusually cold weather, "the latch to which the lock and clip were both secured had loosened from the contracted pole and the dogs were able to create a gap in between the gate and the post large enough for them to get out." Def.'s Mot. for Summary Judgment ("Def's Mot.") ¶ 6.

In addition, Ayers claims Defendant was grossly negligent by not notifying her of the attack and by not following her instructions for medical care, specifically in taking the dogs to a different veterinary clinic than was indicated on an information sheet she had given to him. Here again, Quillen's actions do not rise to the level of recklessness. He made a calculated choice to take the dogs to a vet he felt was appropriate and not to tell Ayers about the incident that day. Although there is some dispute over whether Ayers' vet was available to see the dogs, she had signed a contract authorizing the Kennel to use its discretion in engaging veterinary services. Def.'s Mot. for Summary Judgment Ex.1 at 1. Quillen used the discretion he was authorized to use under the contract in making decisions about medical services for the dogs. The Court has seen no evidence that his intent was evil or that his actions were outrageous, or even that he recklessly or consciously disregarded Ayers' rights. The dogs received prompt treatment and Plaintiff was to return the next day to pick them up. In sum, there is nothing in the record tending to show that

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                  Page 8
Not Reported in A.2d, 2004 WL 1965866
**(Cite as: Not Reported in A.2d)**

Defendant exhibited an "I don't care" attitude. *See Craig v. A.A.R. Realty Corp.*, 576 A.2d 688, 697 (Del.Super.Ct.1989). On the contrary, he took the dogs to the vet immediately; he paid for that service and he did not charge Ayers for the cost of boarding her three dogs.

*9 With this background, Plaintiff is not entitled to punitive damages as a matter of law for her tort claims.

2. Plaintiff's Claim under the Consumer Fraud Act

Under the Consumer Fraud Act, a plaintiff may recover punitive damages "if the fraud is "gross, oppressive, or aggravated, or where it involves breach of trust or confidence." *Stephenson v. Capano Development, Inc.*, 462 A.2d 1069, 1076 (Del.1983). Pursuant to the discussion of the facts above, the Court finds the plaintiff has failed to meet her burden of establishing that the alleged misrepresentation on the Kennel's website was "gross, oppressive, or aggravated." Nor could it be said the representations involved a breach of trust or confidence, when there is no evidence of any other incidents at the Kennel and when the most Quillen could have known was that there was a problem with securing latches properly and that some dalmatians might be dangerous dogs. It is one thing to punish the owner of a kennel for consistent problems, resulting in injuries and distress to the dogs entrusted to its care, but it is quite another to punish him when there has been minimal history of a lack of safety, which has resulted in no other reported attacks. *See Id.* ("[P]unitive damages operate to punish the individual defendant and deter similar conduct by others."). Mere allegations without supporting facts to show that Defendants' actions were in some way egregious are insufficient to support a recovery of punitive damages.

6. Motion in Limine

The Defendant initially presented a Motion in Limine to limit the measure of damages for negligence and negligent bailment to the cost of repair of the dogs since dogs are considered personal property and because there has been no change in value of the dogs' worth other than the vet bills. He claims this amount is $822.28, the cost for the remaining veterinary care. Plaintiff agrees that the compensatory damages are limited to the cost of repair of property or to the change in value of the property. She does not dispute the Defendant's contention that the measure of compensatory damages should be limited. Accordingly, compensatory damages will be limited to what the trier of fact determines is adequate to cover the cost of repair of the dogs.

7. Attorney's fees

Plaintiff has requested an award of attorney's fees for having to defend "such a meritless motion." Whether to award attorney's fees is within the discretion of the Court. *Gannett Co. v. Board of Managers*, 840 A.2d 1232, 1240 (Del.2003). The Court is not convinced that Plaintiff has presented any legitimate reason for an award of attorney's fees. There is no real support for the allegation that Defendant's Motion for Summary Judgment is meritless. In truth, several issues have been decided in favor of the Defendant, negating any contention that the motion was without merit. Plaintiff's request for an award of attorney's fees is denied.

CONCLUSION

*10 For the foregoing reasons, Defendant's Motion for Summary Judgment is granted in part and denied in part. Plaintiff's request for an award of attorneys fees is denied, and Defendant's Motion in Limine is granted. Compensatory damages are limited to costs incurred in the repair of Plaintiff's dogs due to the attack and subsequent treatment.

*IT IS SO ORDERED.*

Del.Super.,2004.
Ayers v. Quillen
Not Reported in A.2d, 2004 WL 1965866

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in A.2d                                                                                          Page 1
Not Reported in A.2d, 2005 WL 1953028
(Cite as: Not Reported in A.2d)

**H**
Not Reported in A.2d, 2005 WL 1953028
Only the Westlaw citation is currently available.
UNPUBLISHED OPINION. CHECK COURT RULES BEFORE CITING.
Superior Court of Delaware.
Dolores WILLIS
v.
CITY OF REHOBOTH BEACH, et al.
No. Civ.A.03C-11-016-RFS.

Submitted March 17, 2005.
Decided June 24, 2005.
Dear Counsel:

STOKES, J.
*1 This is my decision regarding the City of Rehoboth Beach's Motion to Dismiss and for Summary Judgment. For the reasons set forth herein, the City's Motion is granted.

### STATEMENT OF THE CASE

This action stems from a dispute over a building permit issued in November 2001 by the City of Rehoboth Beach ("the City") to Dolores Willis ("Willis") and her now deceased husband, Cecil Willis, (collectively, "the Willises"). The Willises had applied for a building permit to make improvements to their property, a condominium unit that was classified under the Rehoboth Beach Zoning Code ("the Zoning Code") as a garage apartment. The Zoning Code did not permit the expansion of garage apartments in their zone, however. The City, upon discovering that the permit had been issued illegally, in violation of the Code by the building inspector, ordered the Willises to stop the construction in May of 2002. FN1 The Willises applied to the Rehoboth Beach Board of Adjustment ("the Board") for a variance. It was denied, but they were able to acquire a special use exception allowing them to complete some of the improvements. They did not appeal the Board's decision to this Court.

> FN1. The stop work order was issued by letter dated May 30, 2002.

Instead, Willis, for herself and as successor to her deceased husband, brought an action for compensatory and punitive damages against the City of Rehoboth. She claims the City is liable for 1) negligent hiring and supervision of the building inspector; 2) intentional misrepresentation and consumer fraud under the Consumer Fraud Act, 6 *Del. C.* §§ 2511-2527, and at common law; and, 3) deceptive trade practices, prohibited by the Deceptive Trade Practices Act, 25 *Del. C.* §§ 2531-2536. FN2 The City has filed a Motion to Dismiss and for Summary Judgment. It argues that it has municipal immunity under the County and Municipal Tort Claims Act, 10 *Del. C.* §§ 4010-4013, to both the negligence and the fraud claims. In addition, the City claims this suit should be barred because Willis failed to exhaust all of her administrative remedies when she did not directly appeal the Board's decision to the Superior Court. It also argues that Willis has no claim under either the Consumer Fraud Act or the Deceptive Trade Practices Act.

> FN2. Willis also claimed breach of contract against United National Insurance Company, the City's liability insurer, arguing that she and her husband were third party beneficiaries to the insurance policy. United National's policy covered the City for any damages it might be legally obliged to pay due to the wrongful acts of its public officials. This Court, in a previous decision, *Willis v. City of Rehoboth Beach,* Del.Super., C.A. No. 03C-11-016, Stokes, J. (October 1, 2004) (Letter Op.), determined that the Willises were not third party beneficiaries to the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 2

Not Reported in A.2d, 2005 WL 1953028
**(Cite as: Not Reported in A.2d)**

insurance policy and dismissed United National as a party from this case.

### DISCUSSION

The City's Motion is for Dismissal as well as for Summary Judgment. Both parties base their arguments on the pleadings and documents incorporated into those pleadings, such as the application for the permit and the Board's decision to grant a special use exception. Since they have not submitted additional documents outside the pleadings, such as affidavits and depositions, the Court will treat this motion as one for dismissal pursuant to Superior Court Civil Rule 12(b)(6). *Cf. Shultz v. Delaware Trust Co.,* 360 A.2d 576 (Del.Super.Ct.1976) (finding motion to dismiss must be considered as motion for summary judgment when the moving Defendant offered depositions and affidavits in addition to the pleadings).

When the Court considers a motion to dismiss for failure to state a claim, the Court accepts all well-pleaded allegations in the complaint as true. *Spence v. Funk,* 396 A.2d 967, 968 (Del.1978). If the plaintiff can recover under any reasonably conceivable set of circumstances susceptible of proof under the complaint, then it will not be dismissed. *Id.*

*2 The Court first addresses the City's argument that The County and Municipal Tort Claims Act bars Willis' claims of negligence and the intentional tort of common law fraud. It will then consider whether Willis has causes of action under the Consumer Fraud Act and the Deceptive Trade Practices Act. Since the case can be resolved with the consideration of those issues alone, the Court need not address the other arguments raised by the parties.

### I. Municipal Immunity

10 *Del. C.* § 4011(a) provides, "except as otherwise expressly provided by statute, all governmental entities and their employees shall be immune from suit on any and all tort claims seeking recovery of damages." "Governmental entity" is defined in 10 *Del. C.* § 4010 to include any municipality, town, or county.

### A. Negligent Hiring and Supervision

Under the County and Municipal Tort Claims Act (" the CMTCA"), a municipality is generally immune from liability for its tortious acts or omissions. However, 10 *Del. C.* § 4012 provides three exceptions to governmental immunity, stating:
A governmental entity shall be exposed to liability for its negligent acts or omissions causing property damage, bodily injury or death in the following instances:
(1) In its ownership, maintenance or use of any motor vehicle, special mobile equipment, trailer, aircraft or other machinery or equipment, whether mobile or stationary.
(2) In the construction, operation or maintenance of any public building or the appurtenances thereto, except as to historic sites or buildings, structures, facilities or equipment designed for use primarily by the public in connection with public outdoor recreation.
(3) In the sudden and accidental discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalines and toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water.
"The activities listed in Section 4012 are an exclusive list and 'are the only activities as to which municipal immunity is waived." ' *Sussex County v. Morris,* 610 A.2d 1354, 1357 (Del.1992) (citations omitted).

The analysis regarding Willis' negligence claims against the City of Rehoboth is simple. The City has immunity for its negligent acts. The claims of negligent hiring and supervision of the building inspector do not fit into any of the three exceptions to immunity under § 4012. Willis is seeking damages for the City's alleged negligence. Therefore, according to the plain language of the CMTCA, the City has immunity from Willis' negligence claims against it.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                         Page 3
Not Reported in A.2d, 2005 WL 1953028
(Cite as: Not Reported in A.2d)

Willis states in her complaint that the City waived its immunity by the terms of its charter. As pointed out by the City, however, the legislature's grant of immunity cannot be extinguished by such a waiver. The Delaware Supreme Court concluded in *Fiat Motors of North America, Inc. v. Mayor of Wilmington,* 498 A.2d 1062, 1067 (Del.1985), that a municipality may not waive immunity. Only a legislature, by statute, may waive a municipality's immunity. *Id.* FN3 Nowhere has the legislature waived the immunity for a municipality against claims of negligent hiring or supervision of an employee. The only conclusion to be reached is that the City has immunity against Willis' negligence claims for damages.

> FN3. The complete passage is as follows:
> [O]ur analysis must begin with the basic proposition that only the legislature can provide for the waiver of municipal immunity.... We read nothing in the Act itself which indicates an intention by the legislature to allow a municipality to waive its immunity. To the contrary, § 4011(a) states that municipalities shall be immune from all tort claims "[e]xcept as otherwise expressly provided by statute...." We also note that the preamble to the Act indicates the legislative intent to re-establish the principle of municipal immunity in light of the number of frivolous claims and escalating insurance costs.
> (citations omitted).

B. Intentional Misrepresentation and Common Law Fraud

*3 In addition to her claims of a material misrepresentation under the Consumer Fraud Act, Willis alleges common law fraud. The claim is that the City allowed its Building Inspector to issue an illegal permit. To the extent that Willis rests her case on this basis, the City has countered that the CMTCA bars intentional tort claims against it.

Again the analysis of this issue is straightforward. Section 4011 clearly states that "all governmental entities ... shall be immune from suit on *any and all tort claims seeking recovery of damages."* (Emphasis added). Fraud is an intentional tort. FN4 Willis is seeking to recover damages for the fraud. Unless there is an exception to, or waiver of municipal immunity, the City cannot be sued for common law fraud. In this regard, § 4012 provides the only exceptions to immunity. That section states, however, that "[a] governmental entity shall be exposed to liability for its *negligent* acts or omissions" in the enumerated instances. (emphasis added). There is no exception for intentional torts.

> FN4. A tort is a term of art, which has a peculiar and definite meaning in the law. It has been defined as "any act done, or omitted to be done, contrary to the obligation of the law ...; and the damages suffered thereby may be recovered in an action on the case." *Garber v. Whittaker,* 174 A. 34, 36 (Del.Super.Ct.1934). Terms of art or technical terms are to be construed and understood according to their peculiar and appropriate meaning. 1 *Del. C.* § 303. *See also* 73 Am.Jur.2d *Statutes* § 152 (2001) ("Technical words and phrases which have acquired a peculiar and appropriate meaning in the law cannot be presumed to have been used by the legislature in a loose popular sense."). In this regard, a tort consists of all civil wrongs, including intentional torts like fraud, trespass, conversion and assault and battery. *See, e.g., Wise v. Western Union Telegraph Co.,* 172 A. 757, 760 (Del.Super.Ct.1934) (discussing generally duties, and specifically how the transfer of a fraudulent telegram might constitute a wilful injury). Along those same lines, acts that breach a contractual duty are not torts. *See Heronemus v. Ulrick,* 1997 WL 524127, at *3 n. 30 (Del.Super.Ct.) (noting the plaintiffs had actions at contract, not in tort because the duties claimed arose under a contract and not by operation of law); *Ulmer v. Whitfield,* 1985 WL 189262, at *2 (Del.Super.Ct.) (noting that tort liability must based on an act contrary to an obligation at law and on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                         Page 4
Not Reported in A.2d, 2005 WL 1953028
**(Cite as: Not Reported in A.2d)**

a duty other than that created by contract.). *See also* note 11, *infra* (discussing the fact that the CMTCA does not bar contract actions).

This reasoning is supported by the Superior Court's decision in *Schueler v. Martin,* 674 A.2d 882, 886-87 (Del.Super.Ct.1996). In *Schueler,* the Court determined the plaintiff could not seek punitive damages for his injury because the threshold for recovery is reckless or willful or wanton conduct, and the CMTCA does not create an exception to its grant of immunity for anything other than negligent conduct. The Court stated:

> Section 4012 of the Act creates several limited exceptions to local government immunity. The predicate to those exceptions, however, is that the local government employee committed a *negligent* act or omission. Obviously, negligent conduct under § 4012 cannot act as a sufficient predicate to entitle a plaintiff to recover punitive damages from a local government entity.

*Id.*

Unlike the State Tort Claims Act, 10 *Del. C.* §§ 4001-4005, which excepts acts done with gross or wanton negligence from the blanket immunity from tort claims against the State, the CMTCA makes no distinction of tort claims for damages based upon the state of mind of the tortfeasor. *Compare* 10 *Del. C.* § 4001(3) *with* 10 *Del. C.* §§ 4011(a) and 4012. *See also Burns v. United Servs. Auto. Ass'n Props. Fund, Inc.,* 1991 WL 53399 (Del.Super.Ct.)(finding the City of Newark immune from claims of gross or wanton negligence in the inspection of a residence and the issuance of a certificate of occupancy, and noting the differences between the State Tort Claims Act and the CMTCA). Section 4011(a) provides for immunity for municipalities against " any and all tort claims seeking recovery of damages. " Consequently, the City has immunity, and Willis cannot bring a common law fraud claim against it.

Furthermore, even if Willis' claims for negligence and common law fraud were to fall into one of the three exceptions listed in § 4012, the City would still be immune because the claims center around the issuance and revocation of a building permit. Section 4011(b) lists six examples FN5 of when a governmental entity shall not be liable for damage claims, notwithstanding § 4012. Section 4011(b) provides exceptions to § 4012, which in turn provides exceptions to § 4011(a). *Middleton v. Wilmington Housing Authority,* 637 A.2d 828 (Table), 1994 WL 35382, at *2 (Del.). The Section provides that, *inter alia,* "a governmental entity shall not be liable for any damage claim which results from ... (2)[t]he undertaking or failure to undertake any judicial or quasi-judicial act, including .. granting ... or revocation of any license, permit, order or other administrative approval or denial." Since this case unequivocally centers around the issuance and revocation of a building permit, which, under the CMTCA is a quasi-judicial act, the City would be immune from liability for any tort claim for damages arising from the issuance and revocation of the permit under § 4011(b)(2).

> FN5. The full text of § 4011(b) is as follows:
> (b) Notwithstanding § 4012 of this title, a governmental entity shall not be liable for any damage claim which results from:
> (1) The undertaking or failure to undertake any legislative act, including, but not limited to, the adoption or failure to adopt any statute, charter, ordinance, order, regulation, resolution or resolve.
> (2) The undertaking or failure to undertake any judicial or quasi-judicial act, including, but not limited to, granting, granting with conditions, refusal to grant or revocation of any license, permit, order or other administrative approval or denial.
> (3) The performance or failure to exercise or perform a discretionary function or duty, whether or not the discretion be abused and whether or not the statute, charter, ordinance, order, resolution, regulation or resolve under which the discretionary function or duty is performed is valid or invalid.
> (4) The decision not to provide communications, heat, light, water, electricity or solid or liquid waste collection, disposal or treatment services.
> (5) The discharge, dispersal, release or

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                          Page 5
Not Reported in A.2d, 2005 WL 1953028
**(Cite as: Not Reported in A.2d)**

escape of smoke, vapors, soot, fumes, acids, alkalines, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water, except as provided in subdivision (3) of § 4012 of this title.
(6) Any defect, lack of repair or lack of sufficient railing in any highway, townway, sidewalk, parking area, causeway, bridge, airport runway or taxiway, including appurtenances necessary for the control of such ways including but not limited to street signs, traffic lights and controls, parking meters and guardrails.
Paragraphs (1) to (6) of this subsection to which immunity applies are cited as examples and shall not be interpreted to limit the general immunity provided by this section.

*4 In sum, Willis is barred by the CMTCA from bringing suit for damages against the City of Rehoboth Beach for common law fraud and for negligent hiring or supervision.

II. Causes of Action under the Consumer Fraud Act and the Deceptive Trade Practices Act

A. The Deceptive Trade Practices Act

Willis claims that the City engaged in a deceptive trade practice prohibited by the Deceptive Trade Practices Act ("the DTPA") because the building permit "represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." 6 *Del. C.* § 2532(a)(7). She also argues that by allowing an illegal permit to be issued, the City "engag[ed] in ... other conduct which similarly creates a likelihood of confusion or of misunderstanding." *Id.* § 2532(a)(12).

The City contends that Willis has no cause of action under the DTPA because, pursuant to § 2432, the Act does not apply to "[c]onduct in compliance with the orders or rules of, or, a statute administered by, a federal, state, or local government agency." In the alternative, it argues that even if the DTPA is applicable, the Act does not protect "consumers" who are not able to seek an injunction and who do not have a competing business or trade interest with the City. *See Grand Ventures, Inc. v. Whaley*, 632 A.2d 63, 70 (Del.1993). FN6

> FN6. In *Grand Ventures, Inc.,* the Supreme Court clarified a consumer's right of action under the DTPA, stating:
> In short, the most logical interpretation of the Consumer Fraud Act in conjunction with the DTPA is that the Consumer Fraud Act provides remedies for violations of the "vertical" relationship between a buyer (the consumer) and a producer or seller. Damages are the traditional remedy. Conversely, the DTPA addresses unreasonable or unfair interference with the "horizontal" relationships between various business interests. Grand Ventures had only a retail consumer relationship with the defendants. There was no horizontal business or trade interest at stake, as the enumerated deceptive trade practices in § 2532 demonstrate. That significant distinction deprives Grand Ventures, as an insurance purchaser, of standing to seek an injunction under the DTPA. Without such standing one cannot state a cause of action under the DTPA.

In her answer to the City's Motion for Summary Judgment, Willis admits that her DTPA claim is precluded by § 2534 and the fact that she does not allege that she has any competing business interest with the City. As a result of Willis' admissions, this claim shall be dismissed, and the Court need not consider this issue further.

B. The Consumer Fraud Act

Willis' claim under the Consumer Fraud Act ("CFA") alleges that the building permit constituted a material misrepresentation because its issuance certified that the building, as described in the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                  Page 6
Not Reported in A.2d, 2005 WL 1953028
**(Cite as: Not Reported in A.2d)**

application, complied with all provisions of the Zoning Code. Willis argues that the City engaged in an unlawful practice, under 6 *Del. C.* § 2513, which states:

> The act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale, lease or advertisement of any merchandise, whether or not any person has in fact been misled deceived or damaged thereby, is an unlawful practice.

In its Motion for Summary Judgment and in subsequent filings, the City argues that Willis has no claim under the CFA because the issuance of the permit was not a business transaction involving the "sale" of "merchandise." The Court agrees.

The purpose of the Consumer Fraud Act is to "protect consumers and legitimate business enterprises from unfair or deceptive merchandising practices in the conduct of any trade or commerce in part or wholly within this State." 6 *Del. C.* § 2512. Section 2513 covers unlawful acts or omissions employed in connection with a sale, lease or advertisement of merchandise.

*5 A "sale" is defined in the CFA as "any sale, offer for sale or attempt to sell any merchandise for any consideration." A "lease" is "any lease, offer to lease or attempt to lease any merchandise for consideration." *Id.* § 2511(7). An "advertisement is defined as "the attempt by publication, dissemination, solicitation or circulation to induce, directly, any person to enter into any obligation or acquire any title or interest in, any merchandise." *Id.* § 2511(1). Whether or not the issuance of a building permit is a sale or a lease turns upon whether it could be considered a contract. Whether the City's and the building inspector's actions were advertisements of merchandise depends upon whether a building permit can be considered merchandise.

Black's Law Dictionary defines a "sale" as "[t]he transfer of property or title for a price." Black's Law Dict. 1337 (7th ed.1999). It lists four elements necessary to make a sale: "(1) parties competent to contract, (2) mutual assent, (3) a thing capable of being transferred, and (4) a price in money paid or promised." *Id.* A "lease" is "[a] contract by which a rightful possessor of real property conveys the right to use and occupy that property in exchange for consideration." *Id.* at 898.

The issuance of a permit by a Board of Adjustment is not a sale nor a lease, first and foremost, because there is no consideration in such a transaction. As the Texas Court of Appeals stated in *Trevino & Gonzalez Co. v. R.F. Muller Co.,* 949 S.W.2d 39, 42 (Tx.Ct.App.1997): "In the case of a building permit, the issuing municipality must issue a permit where the requesting party meets all of the requirements determined by ordinance to be necessary to its issuance. The discharge of a duty one is already bound to perform is not consideration."

When issuing and revoking permits, the City (and as its agent, the Building Inspector) is exercising the police power delegated to it by the legislature.

> [Z]oning laws and regulations are now uniformly recognized as proper subjects of legislative action. Their propriety stems from the right of the State, in the exercise of the police power, to protect the public health, safety and welfare. And, when the local authority acts in accordance with the powers conferred it does so in its legislative capacity.

*Dukes v. Shell Oil Co.,* 177 A.2d 785, 790 (Del. Ch.1962). *See also* Del. Const. art. II, § 25. FN7 Municipalities are given the authority to regulate and restrict construction of structures in order to promote the health, safety, morals and the general welfare of the community. *See* 22 *Del. C.* § 301. Within this power, they can issue permits and revoke them.

> FN7. The General Assembly may enact laws under which municipalities and the County of Sussex and the County of Kent and the County of New Castle may adopt zoning ordinances, laws or rules limiting and restricting to specified districts and regulating therein buildings and structures

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                Page 7
Not Reported in A.2d, 2005 WL 1953028
**(Cite as: Not Reported in A.2d)**

according to their construction and the nature and extent of their use, as well as the use to be made of land in such districts for other than agricultural purposes; and the exercise of such authority shall be deemed to be within the police power of the State.

A permit issued and revoked in the exercise of the City's police power creates no contractual rights in the parties. *Cf. Vari-Build, Inc. v. City of Reno,* 596 F.Supp. 673, 679 (D.Nev.1984) ("Defendants correctly contend that a license issued in the exercise of the City's police power confers no contractual rights upon the licensee."). *See also* 9 McQuillin Mun. Corp. § 26.81 (3d ed.1995) ( " there is no contract or vested right or property in a license or permit as against the power of the state or a municipality to revoke it for cause or in the exercise of the police power to protect the public health, safety, morals or welfare."). FN8 It is neither a contract generally, nor a sale nor a lease.

> FN8. The author qualifies this statement with two limitations listed in subsequent sections. First, a municipal authority cannot revoke a permit arbitrarily or without cause or without authority of law. *Id.* § 26.81.10. Second, substantial work done or expenditures made under the permit may protect a permittee against revocation, unless there is public necessity. *Id.* § 26.82. However, if a permit is void, i.e., issued illegally, then it confers no vested right to the permittee. *Id.* Neither party disputes in this case the fact that the permit was issued illegally.

While no Delaware case could be found that deals directly with whether the issuance of a permit can constitute a sale under the CFA, in *Miller v. Board of Adjustment of Dewey Beach,* 521 A.2d 642, 647 (Del.Super.Ct.1986), the Court stated, "[t]he general rule ... is that a permit issued illegally, or in violation of the law, or under mistake of fact does not confer a vested right upon the person to whom it is issued, even though that person has made substantial expenditures in reliance thereon." In addition, in *Fliptop, Ltd. v. New Castle County,* 1983 WL 473056, at * 1 (Del.Super.Ct.), the Court found that the issuance of a building permit would not create a contract between the parties.

If the Court were to find that the issuance of a permit does constitute a sale for the purposes of the CFA it would create the untenable result that every time a City revoked an illegal permit it would risk being subject to liability for breach of contract for having done what was necessary to uphold its Code and to protect the public welfare. Not only would such an interpretation frustrate a City's ability to promote the public welfare, but it would also contradict the established legal principle that an administrative body cannot contract away the power granted to it by the legislature. As early as 1895, the United States Supreme Court stated, "[t]he responsibility of the legal authority, municipal or state, cannot be stipulated or bartered away." *Gray v. Connecticut,* 159 U.S. 74, 77 (1895). *See also Hartman v. Buckson,* 467 A.2d 694, (Del. Ch.1983) (" [The City of Camden] may not, under the guise of compromise, impair a public duty owed by it. By entering into the contract in question, Camden bargained away part of its zoning power to a private citizen. It simply does not possess the authority to normally contract such authority ..."). The City must be able revoke a permit in order to protect the public welfare. This Court cannot limit that duty through strained interpretations that impose contractual obligations upon the City for exercising its police power.

*6 To interpret the issuance of a permit as a "sale" or a "lease" under these circumstances would have harmful consequences. If the City were faced with the binding obligation of a sale every time it issued a permit, its ability to promote and protect the health, safety, morals and general welfare of the community would be severely hindered. *Cf. Patzer*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d, 2005 WL 1953028
**(Cite as: Not Reported in A.2d)**

v. *City of Loveland,* 80 P.3d 908, 911 (Colo.Ct.App.2003) (finding that the issuance of a building permit does not create a binding contractual obligation to issue a certificate of occupancy, and noting that if it that were the case, " the City's ability to protect the health, safety, and welfare of the public would be seriously hampered." ).

Moreover, a building permit is not "merchandise." A building permit is a license, which is revocable and authorizes the licensee to construct or alter a structure under the zoning laws of the municipality. *See* Black's Law Dict. 1160, 931 (7th ed.1999); FN9 *Trevino,* 949 S.W.2d at 42 ("A building permit is simply a revocable and alterable license authorizing construction."). According to the CFA, merchandise includes "any objects, wares, goods, commodities, intangibles, real estate or services." 6 *Del. C.* § 2511(4). Black's defines merchandise as " goods that are bought and sold in business; commercial wares." Black's Law Dict. 1000 (7th ed.1999).

> FN9. Black's Law Dictionary defines a permit as "[a] certificate evidencing permission; a license." It defines a license as "[a] revocable permission to commit some act that would otherwise be unlawful."

In the abstract, a building permit might be an " object;" yet, given the purpose of the statute and the meaning of the other words in the definition, it would be illogical to find it is merchandise. " [G]eneral terms in a statute take their meaning from the setting in which they are employed and must be understood as used with reference to the subject matter in the mind of the legislature, and strictly limited to it." 82 C.J.S. *Statutes* § 329 (1999). The purpose of the CFA is to protect consumers from deceptive practices *in the conduct of any trade or commerce.* 6 *Del. C.* § 2512. Goods, wares, commodities, services and real estate are all items generally traded in a commercial market. FN10 In this context, an "object" must be an item which is traded commercially. A permit, however, while it may itself be a tangible piece of paper, simply enables a government to efficiently regulate and enforce its laws. It does not create a right that can be bought and sold. It is revocable and allows a person or business to do something they were not otherwise permitted under the law to do. A building permit cannot legally be traded commercially and, thus, cannot be considered merchandise.

> FN10. Black's defines "goods" as a " [t]angible or movable personal property other than money; esp., articles of trade or items of merchandise" or as "[t]hings that have value, whether tangible or not." Black's, *supra,* at 701. The UCC states that "goods" must be "both existing and identified before any interest in them can pass," unless they are future goods. 6 *Del. C.* § 2-105(2). They are defined as "all things ... which are movable at the time of identification to the contract for sale...." According to Black's, the term "commodity " means "[a]n article of trade or commerce, " which embraces only tangible goods such as products or merchandise, as distinguished from services." Black's, *supra,* at 267. Webster's Third New International Dictionary 2576 (1993) states that "wares" are "manufactured articles, products of art or craft or farm produce offered for sale; articles of merchandise; goods, commodities." The common theme running through all of these definitions is that each of the items is used in the conduct of trade or commerce.

The CFA protects consumers and business enterprises, not citizens from the acts of a government carried out pursuant to its police power. It is focused on fraud in the conduct of trade or commerce, not on fraud in the conduct of a City's power to make and enforce zoning laws. A building permit is not merchandise, and neither can its issuance be considered a sale, lease or an advertisement. The Court finds that a person has no claim against a municipality or its agents for the issuance and/or revocation of a permit under the Consumer Fraud Act. FN11

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in A.2d                                                                                                                          Page 9
Not Reported in A.2d, 2005 WL 1953028
(Cite as: Not Reported in A.2d)

FN11. If Willis had entered into a legitimate contract with the City, she would have a cause of action under the CFA, if it were of a type covered by the Act. In addition, the CMTCA does not bar contract actions against a municipality. In *Middleton v. Wilmington Housing Auth.,* 637 A.2d 828 (Table), 1994 WL 35382 (Del .), *rev'g,* 1993 WL 258817 (Del.Super.Ct.), the Supreme Court reversed a decision of the Superior Court, finding that the CMTCA does not bar contract actions against a municipality. There, Laura Middleton was injured just outside of an apartment she was leasing from the Wilmington Housing Authority. *Middleton,* 1993 WL 258817, at *1. The Court stated, "we continue to hold to the view expressed in our prior decisions that, as a matter of policy, it would be unjust to permit governmental entities to make contracts with private citizens and then breach them with impunity." 1994 WL 35382, at * 2.

*7 Finally, the Plaintiff argues that by not allowing her a cause of action for the alleged misrepresentations of the City, justice will not be carried out. She states, "the interests of justice would not be served by endorsing misrepresentations by the City thereby fostering the false sense of security that an applicant has when a building permit is issued." Pl. Letter Mem., D.I. 34, at 5. The legislature has provided a means, however for aggrieved parties to challenge the arbitrary and unreasonable, and allegedly unlawful actions of a City when granting and revoking building permits. *See* 22 *Del. C.* §§ 324 , 327 and 328 (providing for appeals to the Board and to the Superior Court). The Plaintiff in this case did not seek to appeal the Board's decision to the Superior Court, an option she was clearly allowed to pursue. FN12

FN12. The City also raises the argument that Willis did not exhaust her administrative remedies when she chose not to appeal the Board's decision and instead brought this collateral attack. Because the Court finds Willis has no cause of action it is unnecessary to address this issue; however, it does note that the application of the doctrine of exhaustion of administrative remedies in Delaware is a matter of judicial discretion. *Levinson v. Delaware Compensation Rating Bureau, Inc.,* 616 A.2d 1182, 1189 (Del.1992).

In addition to this appeals process, the Plaintiff could have sought an injunction in the Chancery Court. *See, e.g., Geyer v. City of Rehoboth Beach,* Del. Ch., C.A. No. 22088-S, Chandler, C. (October 14, 2004) (Bench Op.) (enjoining City's stop work order when plaintiffs had detrimentally relied on the City's building permit; noting that the Court had jurisdiction because it could entertain an equitable remedy not available to the Board of Adjustment). A plaintiff whose constitutional rights have been violated may also bring a claim under 42 U.S.C. § 1983. *See, e.g., Heaney v. New Castle County,* 672 A.2d 11, 15-16 (Del.1995) (finding Plaintiffs failed to state a § 1983 claim against New Castle County because they were unable to show the deprivation of any constitutional rights resulting from the action of the County). As for this Court, however, the Plaintiff has presented no claims for which relief can be granted.

CONCLUSION

Considering the Foregoing, the City of Rehoboth Beach's Motion to Dismiss is granted.

*IT IS SO ORDERED.*

Del.Super.,2005.
Willis v. City of Rehoboth Beach
Not Reported in A.2d, 2005 WL 1953028

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.